**In re SPIEGEL, INC., et al., Reorganized Debtors.**

**No. 03–11540 (BRL).**

United States Bankruptcy Court, S.D. New York.

Oct. 19, 2006.

■■■

---

Pachulski Stang Ziehl Young Jones & Weintraub LLP, by William P. Weintraub, Ilan D. Scharf, New York City, for The Spiegel Creditor Trust.

Sullivan & Worcester LLP, by George O. Richardson, III, New York City, for J.P. Morgan Securities, Inc.

### MEMORANDUM DECISION AND ORDER DENYING CLAIM FOR TRANSACTION FEE

BURTON R. LIFLAND, Bankruptcy Judge.

On remand from two levels of appeal, the Spiegel Creditor Trust (the "Trust"), successor in interest to Spiegel, Inc. ("Spiegel") and its affiliates (together with Spiegel, the "Spiegel Group" or "Debtors"), submits this renewed objection to the claim of J.P. Morgan Securities, Inc. ("JP Morgan").

### Background

Spiegel was an international general merchandise and specialty retailer marketing apparel, home furnishings and other merchandise to customers through catalogs, approximately 560 specialty retail and outlet stores, and e-commerce sites. Spiegel traditionally divided its operations into two distinct segments: retail merchandising and credit card. The retail business was operated through its three merchant divisions and various support operations. The three merchant divisions—Eddie

Bauer, Spiegel Catalog and Newport News—were respectively comprised of several entities (each such division, a "Merchant Company").

The credit card business, a stand-alone business enterprise, operated primarily through Spiegel's wholly-owned subsidiary, First Consumers National Bank ("FCNB") which it acquired in 1990. FCNB offered two general types of credit programs. The first type was traditional bankcards, such as MasterCard and Visa. These bankcards included secured cards, co-branded cards and affinity cards such as the FCNB MasterCard and FCNB Visa card. FCNB's website reported that, by the beginning of 2001, FCNB was the 27th-largest bankcard issuer in the United States, out of nearly 3000 financial institutions issuing such cards.[1]

The second category of cards issued by FCNB were so-called "preferred" or private label credit cards for use at the Merchant Companies. The preferred cards bore the logo of Eddie Bauer, Newport News or Spiegel. FCNB's website reported that, by the beginning of 2001, FCNB had the 10th-largest private label credit card portfolio in the United States. During the 2002 fiscal year, customers used FCNB's private-label cards to make approximately 18% of Eddie Bauer net sales, 62% of Spiegel net sales, and 48% of Newport News net sales.

FCNB securitized the receivables generated from its cardholder's retail purchases, managed the securitized portfolios for a fee and retained an interest in the securitized pools. According to Spiegel's 8–K filed on February 25, 2003, a principal

source of liquidity for the Spiegel Group had been its ability to securitize substantially all of the credit card receivables generated by the private-label cards and bankcards. FCNB securitized the receivables by selling them to an intermediary special purpose entity ("SPE"), which, in turn, resold the receivables to a qualified special purpose entity ("QSPE"), structured as a common law master trust. Each QSPE sold multiple series of certificates or notes ("Series") to investors at different times. Each series also assigned the retained interest to Spiegel Acceptance Corporation or to FCNB. FCNB then transferred part of its retained interest to Financial Services Acceptance Corporation (another Spiegel affiliate). These retained interests generated "finance revenue" for Spiegel that essentially came from excess cash flows after required payments to the investors in the trusts and deductions were made. *(See* Examiner's Report at 91).

Under these arrangements, the securitization vehicles had outstanding an aggregate of approximately $2.2 billion of notes and certificates at the end of December 2002. In the ordinary course of business, the securitization transactions returned a significant portion of the proceeds of collections on receivables sold into these securitization transactions to FCNB in exchange for the deposit of additional receivables. However, upon the occurrence of certain events specified in transaction documents for these securitization transactions (each such event, a "Pay–Out Event"), the transaction documents provided that substantially all of the proceeds of receivables that would otherwise be paid to FCNB in exchange

---

1. *See United States Securities and Exchange Commission v. Spiegel. Inc.,* Case No. 03 C 1685 (N.D.Ill.), Independent Examiner's Report Concerning Spiegel, Inc., (hereinafter

"Examiner's Report") at 8–9, dated Sept. 25, 2003 (Exhibit 10 to Declaration of George O. Richardson III).

for the deposit of additional receivables were allocated to the repayment of amounts owed to the holders of the asset-backed securities. Notwithstanding such fact, during any such Pay–Out Event FCNB was nevertheless still required under the securitization transaction documents to deposit new receivables into the securitization transactions irrespective of whether or not FCNB had sufficient funds to reimburse the Merchant Companies for charges made with the private label credit cards issued by it.

In late 2001, the Office of the Comptroller of the Currency (the "OCC"), the primary federal regulator of FCNB, began an investigation of FCNB.[2] In the fourth quarter of fiscal 2001, Spiegel formalized a plan to sell its bankcard segment which was made up primarily of FCNB and its Financial Services Acceptance Corporation.

In February 2002, the Spiegel Group determined, with its lending institutions, that a material adverse change had occurred due to the operating performance experienced in the fourth-quarter of fiscal 2001. Spiegel then engaged JP Morgan to find a purchaser for FCNB and the parties entered into an engagement letter dated February 20, 2002 (the "Engagement Letter"). Pursuant to the terms of the Engagement Letter, Spiegel paid JP Morgan a non-refundable $500,000 engagement fee and agreed to pay certain other fees to JP Morgan upon the closing of a "Transaction." Under the terms of the Engagement Letter, a Transaction could occur if,

*inter alia,* a third party acquired a material portion of the assets, properties and/or businesses of Spiegel's credit card business.

On May 15, 2002, FCNB entered into an agreement with the OCC. The agreement called for FCNB to comply with certain requirements and restrictions regarding its bankcard business and on November 27, 2002, the OCC approved a disposition plan for FCNB. Under the terms of the disposition plan, if FCNB did not receive an acceptable offer to buy the bankcard portfolio by January 2003, it was required to implement plans to liquidate its bankcard portfolio. FCNB did not receive any such acceptable offer.

According to the Examiner's Report, Spiegel had difficulty selling its credit card receivables portfolio. By mid-June 2002, the best offer for the combined preferred and bankcard portfolio was at an 18% discount. This offer was the only bid in excess of Spiegel's securitization debt outstanding. Other bids were at a greater discount. *(See* Examiner's Report at 76).

On February 14, 2003, Spiegel received a letter from the OCC requiring FCNB to immediately begin the process of liquidating the bankcard receivables portfolio and indicating the steps it must take to do so. Specifically, FCNB was required to: (i) notify the trustee for each Series that FCNB would either amend the relevant securitization documents to replace FCNB with a successor servicer and administrator or resign; (ii) cease all credit card

---

**2.** According to the Examiner's Report, in 1999, Spiegel embarked on a program to improve poor sales performance that one of its audit committee members later called "easy credit to pump up sales." Through various techniques, "Spiegel tilted its portfolio of credit card customers decidedly in the di-

rection of high-risk subprime borrowers." As the economy worsened, charge-offs of uncollectible receivables climbed dramatically and its asset-backed securitizations were close to hitting performance "triggers." *See* Examiner's Report at 2–3.

solicitations for its bankcards; (iii) cease accepting new bankcard applications and credit lines and offering credit line increases to any existing bankcard account; (iv) notify cardholders that FCNB would no longer honor bankcard charges on or before March 31, 2003; and (v) cease accepting new charges on existing bankcards on or before April 1, 2003.[3]

On March 7, 2003, FCNB discontinued charging privileges on all MasterCard and Visa bankcards issued by FCNB to its customers and began the liquidation process required by the OCC. On March 14, 2003, the OCC commenced a cease and desist proceeding against FCNB and issued a temporary cease and desist order indicating, among other things, that FCNB should cease performing its duties as servicer of the bankcard and private-label receivables securitizations as soon as practicable. No successor to FCNB to perform these essential functions which were at the heart of Spiegel's credit card business was ever put into place. On March 11, 2003, the Merchant Divisions ceased honoring the private-label credit cards issued to their customers by FCNB.

On March 17, 2003 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On the Petition Date, the Merchant Companies filed a motion requesting authority to reject "Preferred Charge Merchant Agreements" with FCNB (the "FCNB Merchant Agreements"). The FCNB Merchant Agreements provided, among other things, for the Merchant Companies to accept the private label cards issued by FCNB and to remit the

sales slip from any such sale to FCNB for deposit into the securitization vehicles. On March 18, 2003, this Court authorized the Merchant Companies to reject the FCNB Merchant Agreements. *See* Order Pursuant to 11 U.S.C. § 365(a) Authorizing the Debtors to Reject Certain Executory Contracts, dated March 18, 2003.

Since sales to customers using such cards were a significant portion of the Merchant Companies' sales, the Merchant Companies determined that they had to find an alternative way to issue private label credit cards to their retail customers. At first, the Merchant Companies began to directly extend credit to new customers through a private label credit card program (the "Merchant Private Label Program"). The Merchant Private Label Program was not related to the FCNB private label credit card program, and no receivables generated by the Merchant Private Label Program were transferred to the securitization vehicles. In the end, the Merchant Companies determined that the continuation of the Merchant Private Label Program would not be feasible given their inability to obtain the financing required to support the program. Thereafter, the Merchant Companies contracted with World Financial Network National Bank ("World Financial") to issue private label credit cards for use at the Merchant Companies (the "World Financial Agreements"). The World Financial Agreements implemented a new private label credit card program for each Merchant Company. In April 2003, Spiegel sought authorization from the Bankruptcy Court to enter into the World Financial Agreements. *See* Affidavit of James Brewster in

---

3. *See* Affidavit of William C. Kosturos Pursuant to Local Bankruptcy Rule 1007–2 in Support of Voluntary Petitions and Various First Day Applications and Motions, ¶ 54, dated March 17, 2003, ECF Doc. 5.

Support of Motion of the Debtors for Order to Show Cause Setting an Expedited Hearing and Shortening Notice and Order Pursuant to 11 U.S.C. § 363(b)(1) Authorizing the Debtors to Execute, and Perform Under Private Label Credit Card Program Agreements with World Financial Network National Bank, dated April 28, 2006, ECF Doc. 239.

On May 29, 2003, the Bankruptcy Court authorized Spiegel to approve a plan of liquidation of FCNB under the OCC requirement for prompt statutory liquidation. Spiegel's motion described the plan as providing for (i) the maintenance of a certain deposit necessary to retain FCNB's insured status for so long as its national bank charter remained outstanding; (ii) discontinuation of servicing and closure of payment accounts for such servicing; (iii) commencement of statutory liquidation under 12 U.S.C. § 181; and (iv) completion of payment of non-deposit liabilities. Alternatively, the plan called for establishment of a liquidating trust to benefit FCNB's remaining creditors or for the consummation of a merger with a related non-bank entity approved by the OCC. (See Motion of the Debtors for Order to Show Cause Setting an Expedited Hearing and Shortening Notice and Order Pursuant to 11 USC § 105(a) and 363(b) Authorizing the Debtors to Approve the FCNB Liquidation Plan and to Appoint James E. Huston as the Liquidating Agent for

FCNB, dated May 16, 2003, ECF Doc. 376).

On May 25, 2005, the Debtors confirmed their Modified First Amended Joint Plan of Reorganization of Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"). On June 21, 2005, the Debtors' Plan went effective, and the Debtors emerged from chapter 11 as a reorganized entity.

JP Morgan filed a proof of claim, seeking approximately $3,528,995.26 from Spiegel on account of (i) a "Transaction Fee" that JP Morgan claimed it earned pursuant to the terms of the Engagement Letter; and (ii) certain expenses related to JP Morgan's work on behalf of Spiegel.

The Debtors filed an objection to JP Morgan's claim. Under the terms of the Plan, the Trust succeeded to Spiegel's position with respect to the Claim. The Trust argued, among other things, that because there was no sale, JP Morgan was not entitled to a fee. JP Morgan, however, claimed that the World Financial Agreements were sufficient to fit with the definition of Transaction as set forth in the Engagement Letter.[4]

The Bankruptcy Court[5] sustained Spiegel's objection to the Claim. While recognizing that JP Morgan's claim was based on paragraph (c), (see fn. 4), Judge Blackshear concluded that the Engagement Let-

---

4. The Engagement Letter provides, in relevant part:

For the purposes hereof, the term "Transaction" shall mean, whether in one or a series of transactions, (c) the acquisition by a Purchaser, directly or indirectly, of a material portion of the assets, properties and/or businesses of the Business, by way of a direct or indirect purchase, lease, license, exchange, joint venture or other means, including, but not limited to, any agreement between [Spiegel] and a Purchaser with respect to

the future origination of credit card assets (any such agreement, an Operating Agreement).

Engagement Letter, introductory paragraph, definition of Transaction, Clause (c).

5. At that time the Hon. Cornelius Blackshear presided over the Spiegel chapter 11 cases but has since retired and the matter has been reassigned to the undersigned on remand.

ter required that a "transaction" involve "some type of sale." *See In re Spiegel, Inc.,* Post–Hearing Opinion on Spiegel's Objection to Claim Number 2192 of J.P. Morgan Securities, Inc., dated February 18, 2005, Case No. 03–11540, at 7–8. On appeal, the District Court disagreed with the Bankruptcy Court's reasoning but arrived at the same conclusion that the World Financial Agreement did not constitute a "transaction" under the Engagement Letter and therefore JP Morgan was not entitled to a transaction fee. *See J.P. Morgan Securities, Inc. v. Spiegel, Inc.(In re Spiegel, Inc.),* Case No. 05–CV–3508, Transcript of Hearing dated June 24, 2005. On further appeal, the Second Circuit agreed with the District Court's rejection of the Bankruptcy Court's reasoning finding that "the express terms of the Engagement Letter make clear that no sale is required." *See J.P. Morgan Securities, Inc. v. Spiegel, Inc. (In re Spiegel, Inc.),* No. 05–4165, 175 Fed.Appx. 409, Summary Order dated March 30, 2006 at 3–4. However, the Second Circuit found that the reasons given by the District Court for disallowing the claim were also invalid. *Id.* at 4. The Court observed that although the individual credits processed by World Financial were not the same credits and payments as had been processed by FCNB, the Court found nothing in the Engagement Letter that required transfer of the very same transactions or credits to the acquiring entity. The Court continued, however, noting that although it rejected the reasons given by both the Bankruptcy and District Courts, the Second Circuit could not be certain on the "sparse record available" to it, whether JP Morgan was entitled to the fee. *Id.* The Court said

"[w]e express no view as to whether there are ambiguities in the Engagement Letter or other factual issues which may affect the resolution of this dispute." Having rejected the reasons of the lower courts for disallowance of JP Morgan's claims, the Court vacated the disallowance of the claim and remanded to the District Court for further proceedings.[6] *Id.* The District Court then remanded the appeal to this Court. *See J.P. Morgan Securities, Inc. v. Spiegel, Inc. (In re Spiegel, Inc.),* Case No. 05–CV–3508, Order dated 7/13/2006.

The Trust filed a renewed objection to JP Morgan's claim, JP Morgan filed a response and both parties submitted voluminous exhibits curing the "sparseness" of the record that the Second Circuit had before it. After reading all of the papers, and conducting an analysis of the exhaustive record now submitted by the parties, this Court must still find that JP Morgan is not entitled to a Transaction Fee.

## Discussion

It is clear from the affidavits submitted by the parties involved and the history and sequence of events that JP Morgan essentially was retained to sell the FCNB business. That, however, is not what the Engagement Letter says. It is also clear that the Debtors, their estates and ultimately, their creditors received zero dollars from the engagement of JP Morgan. What the Engagement Letter does say, in relevant part, is:

> For the purposes hereof, the term "Transaction" shall mean, whether in one or a series of transactions,
>
> (c) the *acquisition* by a Purchaser, directly or indirectly, of a *material por-*

6. The Court did find that the Engagement Letter unambiguously entitled JP Morgan to be reimbursed for its reasonable expenses ir-

respective of whether any Transaction occurred.

*tion of the assets, properties and/or businesses of the Business,* by way of a direct or indirect purchase, lease, license, exchange, joint venture or other means, including, but not limited to, any agreement between [Spiegel] and a Purchaser with respect to the future origination of credit card assets (any such agreement, an Operating Agreement).

*See* Engagement Letter, introductory paragraph, clause c (emphasis added). "Business" is defined as "the Company's credit card businesses including, but not limited to, its bankcard, preferred card and First Consumers National Bank businesses, and including any subsidiary that owns or operates any such business or any entity to which any such business is transferred." *See* Engagement Letter, introductory paragraph.

JP Morgan argues that the World Financial Agreements constitute the acquisition by World Financial of a material portion of the assets, properties and/or businesses of Spiegel's credit card Business. I disagree. First, the Business was a real business that involved more than simply an agreement to issue private credit cards. FCNB's business included the securitization of receivables and fees for the management of such portfolios. FCNB also retained a residual interest in the securitized pools. World Financial acquired none of that "business." Moreover, World Financial did not acquire any assets of the Business and no properties of FCNB were transferred to World Financial. No accounts, balances or residuals were transferred. The right to provide customers of the Merchant Companies with private label credit cards in the name of the Merchant Companies belonged to the Merchant Companies—not FCNB.

The World Financial Agreements did not constitute "Transactions" within the meaning of the Engagement Letter—they were simply service contracts to administer private label credit cards between the Merchant Companies and World Financial. In essence, the World Financial Agreements are akin to factoring agreements, not the type of transaction within the purview of the Engagement Letter. JP Morgan's argument that World Financial acquired the Business merely because under the Agreements it issued credit cards in the Merchant Companies' names and used the Merchant Companies customer lists to solicit new accounts is ludicrous. Any standard service agreement with a merchant company to administer a private label credit card program would, at a minimum, require that cooperation. Moreover, whether World Financial on its own initiative and for its own benefit subsequently securitized the resulting credit card receivables or utilized some other form of financing is irrelevant and has nothing to do with the World Financial Agreements.

In addition to the language of the Engagement Letter, the affidavits of the parties and the history of events as set forth above and below, further demonstrate that the World Financial Agreements are not Transactions giving rise to entitlement to a $4 million fee. When the parties were invited by the Bankruptcy Court after the original hearing on the objection to JP Morgan's claim, the Debtors submitted unrebutted affidavits of two of its officers. First, John Steele, Treasurer of Spiegel, who was involved in negotiating the Engagement Letter, explained that Spiegel sought to retain JP Morgan to sell the "business." After the Engagement Letter was signed and the sale process was begun, it became apparent that Spiegel could not sell the business without incurring a loss.

In addition, James Brewster, a Senior Vice President and Chief Financial Officer of Spiegel, explained that JP Morgan did not introduce the Debtors to World Financial during the sale process. Instead, there was a prior existing relationship between the Debtors and Alliance Data Systems—World Financial's parent—that predated JP Morgan's retention and the Engagement Letter. Nor did JP Morgan advise the Debtors either prior to or after the Petition Date with respect to the Debtors' agreements with World Financial. Moreover, as explained by Mr. Brewster, and unrebutted by JP Morgan, it is "patently absurd to suggest that a company of Spiegel's sophistication would retain an investment bank—and pay $4 million—to negotiate the terms of a garden variety credit agreement." Indeed, neither of the Debtors' postpetition financial nor management advisors were needed to negotiate the World Financial Agreements.

For all of the reasons set forth above, I find that JP Morgan is not entitled to a Transaction Fee.

**Conclusion**

Accordingly, the Trust's objection to JP Morgan's claim for a Transaction Fee is sustained. However, JP Morgan may retain the non-refundable retainer of $500,000. Additionally, pursuant to the decision of the Second Circuit, the Trust's objection to JP Morgan's claim for reimbursement of expenses is denied and the claim for reimbursement of expenses is allowed.

IT IS SO ORDERED.